DA 22-0064

IN THE SUPREME COURT OF THE STATE OF MONTANA

2023 MT 224

MONTANA ENVIRONMENTAL INFORMATION
CTR. and SIERRA CLUB,

       Plaintiffs/Appellees,

  v.

WESTMORELAND ROSEBUD MINING, LLC, f/k/a
WESTERN ENERGY CO., NAT. RES. PARTNERS, L.P.,
INT'L UNION OF OPERATING ENGINEERS, LOCAL
400, and N. CHEYENNE COAL MINERS ASS'N,

       Respondent-Intervenors/Appellants.

MONTANA ENVIRONMENTAL INFORMATION
CTR. and SIERRA CLUB,

       Petitioners/Appellees,

  v.

MONTANA DEP'T OF ENVIRONMENTAL QUALITY,

       Respondent/Appellant,

MONTANA BD. OF ENVIRONMENTAL REVIEW,
WESTMORELAND ROSEBUD MINING, LLC, f/k/a
WESTERN ENERGY CO., NAT. RES. PARTNERS L.P.,
INT'L UNION OF OPERATING ENGINEERS, LOCAL
400, and N. CHEYENNE COAL MINERS ASS'N,

       Respondents.

MONTANA ENVIRONMENTAL INFORMATION
CTR. and SIERRA CLUB,

       Plaintiffs/Appellees,

  v.

MONTANA DEP'T OF ENVIRONMENTAL QUALITY,
MONTANA BD. OF ENVIRONMENTAL REVIEW,

Respondents,

and

WESTMORELAND ROSEBUD MINING, LLC, f/k/a
WESTERN ENERGY CO., NAT. RES. PARTNERS L.P.,
INT'L UNION OF OPERATING ENGINEERS, LOCAL
400, and N. CHEYENNE COAL MINERS ASS'N,

Respondent-Intervenors/Appellants.

---

APPEAL FROM: District Court of the Sixteenth Judicial District,
In and For the County of Rosebud, Cause No. DV 19-34
Honorable Katherine M. Bidegaray, Presiding Judge

COUNSEL OF RECORD:

For Appellant Montana Department of Environmental Quality:

Nicholas A. Whitaker, Jeremiah Langston (argued), Department of
Environmental Quality, Helena, Montana,

For Appellant Montana Board of Environmental Review:

Amy D. Christensen, J. Stuart Segrest, Christensen & Prezeau, PLLP,
Helena, Montana

For Intervenor and Appellant Westmoreland Rosebud Mining, LLC, et al.:

John C. Martin (argued), Holland & Hart LLP, Jackson, Wyoming

Kyle A. Gray, Holland & Hart LLP, Billings, Montana

Samuel R. Yemington, Holland & Hart LLP, Cheyenne, Wyoming

For Appellees:

Shiloh Hernandez (argued), Earthjustice, Bozeman, Montana

Derf Johnson, Montana Environmental Information Center, Helena,
Montana

Roger Sullivan, McGarvey Law, Kalispell, Montana

Walton D. Morris, Morris Law Office, Charlottesville, Virginia

For Amicus Curiae:

Robert L. Sterup, Brown Law Firm. PC, Billings, Montana

Argued:  April 3, 2023
Submitted:  May 9, 2023
Decided:  November 22, 2023

Filed:

Clerk

3

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1      Montana Department of Environmental Quality (DEQ or Department), the Montana Board of Environmental Review (Board), and Westmoreland Rosebud Mining, LLC (formerly known as Western Energy Co., Natural Resources Partners L.P., International Union of Operating Engineers, Local 400), and Northern Cheyenne Coal Miners Association (collectively, Westmoreland), appeal a Sixteenth Judicial District Court ruling in favor of Montana Environmental Information Center and Sierra Club (collectively, Conservation Groups) vacating DEQ's permit for Westmoreland's proposed coal mine expansion pursuant to the Montana Strip and Underground Mine Reclamation Act (MSUMRA).

¶2      We affirm in part, reverse in part, and remand to the District Court for proceedings consistent with this Opinion.  The District Court's order to vacate the AM4 Permit is reinstated.

¶3      In 2009, Westmoreland applied for its fourth amendment to its Area B mining permit (AM4 Permit) seeking to expand coal mining operations at the Rosebud mine in Colstrip, Montana.[1]  Pursuant to MSUMRA, DEQ approval of the permit is conditioned on DEQ's determination that the proposed mining activity is "designed to prevent material damage" to the hydrologic balance outside the permit area.  Section 82-4-227(3)(a), MCA.  At the time of approval, "material damage" with respect to the protection of the hydrologic balance was defined as:

---

[1] For a more detailed description of the Rosebud mining operations, *see Mont. Envtl. Info. Ctr. v. Mont. Dep't of Envtl. Quality*, 2019 MT 213, 397 Mont. 161, 451 P.3d 493 (*MEIC 2019*).

degradation or reduction by coal mining and reclamation operations of the quality or quantity of water outside of the permit area in a manner or to an extent that land uses or beneficial uses of water are adversely affected, water quality standards are violated, or water rights are impacted. Violation of a water quality standard, whether or not an existing water use is affected, is material damage.

Section 82-4-203(32), MCA (2015).[2]

¶4 Area B is located within the watershed of the nearby upper East Fork Armell's Creek (Creek), a small watercourse with intermittent to ephemeral flows that eventually drains to the Yellowstone River. The present appeal centers around the permit's potential impacts on the Creek and its alluvium. The Creek's water quality standard designation is a C-3[3] surface water, which requires the Creek to be suitable for various uses including, as relevant here, "growth and propagation of non-salmonid fishes and *associated aquatic life*." Admin. R. M. 17.30.629(1) (2017) (emphasis added). The Creek's surface water is not currently subject to any *numerical* standards for various pollutants. DEQ attainment documents indicate the Creek has been listed as "impaired" for meeting its aquatic life support standards.[4]

---

[2] This definition has since been amended, but we look to the law at the time DEQ approved the permit for whether it followed the law.

[3] Water quality standards are established by the Board pursuant to the federal Clean Water Act, 33 U.S.C. § 1313, and the Montana Water Quality Act, Title 75, chapter 5, MCA. *See MEIC 2019*, ¶ 40.

[4] Since at least 2006, DEQ has designated the stream as impaired and failing to achieve water quality standards for supporting growth and propagation of aquatic life. DEQ identified excessive salinity, measured by total dissolved solids (TDS) and specific conductivity as a cause of the impairment and identified coal mining as an unconfirmed source of excessive salt. *See generally MEIC 2019*.

¶5   We restate the issues on appeal as follows:

*Issue One: Whether the Board of Environmental Review applied the wrong burden of proof.*

*Issue Two: Whether the Board of Environmental Review improperly limited Conservation Groups' evidence and argument.*

*Issue Three: Whether the Board of Environmental Review improperly relied on facts and opinions regarding salinity concentrations that were not included in the Cumulative Hydrologic Impact Assessment.*

*Issue Four: Whether the Board of Environmental Review erred in holding that extending the duration, but not the magnitude, of a water quality violation could not constitute material damage.*

*Issue Five: Whether the Board of Environmental Review improperly excluded the cumulative impact of mining activity from its analysis.*

*Issue Six: Whether the Board of Environmental Review improperly relied upon evidence regarding aquatic life.*

*Issue Seven: Whether the District Court erred in its award of attorney fees.*

*Issue Eight: Whether the Board of Environmental Review was properly included as a party on judicial review.*

We affirm the District Court on Issues Two, Four, and Five. We reverse the District Court on Issues One, Three, Six, Seven, and Eight.

## FACTUAL AND PROCEDURAL BACKGROUND

¶6   During a six-year permit application review, DEQ and Westmoreland engaged in a back-and-forth process through which Westmoreland addressed various concerns raised by DEQ. When DEQ deemed Westmoreland's application—which contained a lengthy Probable Hydrological Consequences (PHC) report and addendum—to be acceptable, it solicited public objections to the proposed permit. Conservation Groups filed objections

6

on August 3, 2015. DEQ subsequently responded to these comments and issued its written findings and Cumulative Hydrologic Impact Assessment (CHIA) in December 2015. DEQ found that Westmoreland had made the required showing that the permit proposal was designed to prevent "material damage" under MSUMRA and greenlit the permit proposal.

¶7 Conservation Groups challenged the decision to the Board. After lengthy discovery, a Board hearing examiner held a four-day hearing in which Conservation Groups, DEQ, and Westmoreland presented evidence and argument. After the hearing, the hearing examiner recommended that the Board uphold DEQ's permitting decision. The Board majority adopted in large part the hearing examiner's proposed findings of fact and conclusions of law in favor of DEQ, holding that Conservation Groups had failed to carry the burden of proving that the permit would cause material damage.

¶8 Conservation Groups sought judicial review from the Sixteenth Judicial District Court, naming the Board as a party along with Westmoreland and DEQ.[5] Conservation Groups challenged the Board's analysis as erroneously placing the burden of proof on Conservation Groups, rather than Westmoreland, in proceedings before the Board. Conservation Groups also challenged the hearing examiner's evidentiary decisions in limiting Conservation Groups' argument and evidence to issues raised in pre-CHIA objections; allowing Westmoreland and DEQ to present post-decisional evidence and rationales in support of DEQ's permitting decision; and admitting testimony by a DEQ hydrologist on aquatic life. Conservation Groups also challenged the Board's substantive

_____

[5] The District Court denied the Board's motion to be dismissed as a non-necessary party.

7

reliance upon an allegedly-unreliable aquatic life survey and its ultimate conclusion, in light of a projected 13% increase in TDS in the Creek's alluvium, that the Creek would not suffer material damage in the form of a water quality violation. Further, they question the Board's determinations that the duration of the projected increase in TDS and the cumulative effects of mining in the area are not relevant to an analysis of whether the proposed mine expansion was designed to prevent material damage to the hydrologic balance outside the permit area.

¶9 The District Court ruled in favor of Conservation Groups on these issues and vacated Westmoreland's AM4 Permit. We stayed the vacatur pending appeal.[6] The District Court also granted Conservation Groups nearly $900,000 in attorney fees and costs. DEQ and Westmoreland appeal the District Court's rulings overturning the Board, its vacatur remedy, and the award of attorney fees. The Board appeals the District Court's denial of the Board's motion to be dismissed from judicial review. Additional factual and procedural history is presented as relevant below.

## STANDARDS OF REVIEW

¶10 The Montana Administrative Procedure Act (MAPA) provides the applicable standards of judicial review of an agency decision. Section 2-4-704, MCA. On appeal, this Court applies the same standards of review that a district court applies. *Whitehall Wind, LLC v. Mont. Pub. Serv. Com.*, 2015 MT 119, ¶ 8, 379 Mont. 119, 347 P.3d 1273. A court may reverse or modify the decision if the petitioner's substantial rights have been

---

[6] *MEIC v. Western Energy*, No. DA 22-0064, Order (Mont. Aug. 9, 2022).

prejudiced through findings, inferences, conclusions, or decisions that violate constitutional or statutory provisions, exceed the agency's statutory authority, are made upon unlawful procedure, are affected by some other error of law, are clearly erroneous in view of the record evidence, or are arbitrary, capricious, or characterized by abuse of discretion. Section 2-4-704(2)(a), MCA. While we do not substitute our judgement for that of the agency as to the weight of the evidence on factual questions, § 2-4-704(2), MCA, a finding of fact may be reversed for clear error if "it is not supported by substantial evidence in the record, if the fact-finder misapprehended the effect of the evidence, or if a review of the record leaves the court with a definite and firm conviction that a mistake has been made." *Nw. Corp. v. Mont. Dep't of Pub. Serv. Reg.*, 2016 MT 239, ¶ 26, 385 Mont. 33, 380 P.3d 787. "Where the agency's interpretation of its rule or regulation is within the range of reasonable interpretation, it is lawful and deserves deference." *MEIC 2019*, ¶ 22 (citing *Clark Fork Coal. v. Mont. Dep't of Envtl. Quality*, 2008 MT 407, ¶¶ 20, 27, 347 Mont. 197, 197 P.3d 482 (*Clark Fork 2008*)). We recognize an agency's superior specific, technical, and scientific knowledge, but the agency must still be able to "articulate a satisfactory explanation for its actions and provide a rational connection between the facts found and the choice made." *MTSUN, LLC v. Mont. Dep't of Pub. Serv. Reg.*, 2020 MT 238, ¶ 52, 401 Mont. 324, 472 P.3d 1154. We ask whether agency interpretation of the law is correct but defer to agency interpretations of its own rules or regulations that fall within a reasonable range of interpretation. *Vote Solar v. Mont. Dep't of Pub. Serv. Reg.*, 2020 MT 213A, ¶¶ 35, 37, 401 Mont. 85, 473 P.3d 963.

¶11 In evaluating requests for attorney fees, Montana courts first look to whether legal authority exists to award those fees. *Folsom v. City of Livingston*, 2016 MT 238, ¶ 13, 385 Mont. 20, 381 P.3d 539. Whether legal authority exists to support an award of attorney fees is a question of law, reviewed for correctness. *Chase v. Bearpaw Ranch Ass'n*, 2006 MT 67, ¶ 14, 331 Mont. 421, 133 P.3d 190.

¶12 If the legal authority exists to support an award of attorney fees, then the amount of the award falls within a district court's discretion, which we will not disturb unless the district court acted arbitrarily, without conscientious judgment, or exceeded the bounds of reason in making the award. *Shephard v. Widhalm*, 2012 MT 276, ¶ 35, 367 Mont. 166, 290 P.3d 712.

## DISCUSSION

¶13 *Issue One: Whether the Board of Environmental Review applied the wrong burden of proof.*

¶14 The District Court concluded that the Board had erroneously placed the burden of proof on Conservation Groups in the contested case hearing, a conclusion DEQ and Westmoreland now challenge. Under MSUMRA, DEQ may not approve a permit application "unless the application affirmatively demonstrates that . . . the proposed operation of the mining operation has been designed to prevent material damage to the hydrologic balance outside the permit area." Section 82-4-227(3)(a), MCA. MSUMRA also allows an applicant, permittee, or person with an interest in a decision to grant a permit to request a hearing before the Board within 30 days of DEQ's decision. Section 82-4-206(1), MCA. The parties agree the statute requires Westmoreland to bear the burden

10

of proving no "material damage" in order to succeed in applying for the AM4 Permit from DEQ. The parties disagree, however, on which party should have been required to carry the relevant burden in the subsequent contested case before the Board challenging DEQ's permitting decision. Conservation Groups assert that the burden remains on Westmoreland to prove an absence of "material damage," while DEQ asserts that the burden properly shifted to Conservation Groups to prove that DEQ's grant of the AM4 permit violated Montana law.

¶15    MSUMRA provides that a contested case on a DEQ permit decision will be held pursuant to the procedures provided for by MAPA. Section 82-4-206(2), MCA.[7] MAPA, in turn, provides that a contested case is bound by common law and statutory rules of evidence unless otherwise provided for. Section 2-4-612(2), MCA. Title 26, chapter 1, MCA, is entitled "Statutory Provisions on Evidence" while Part 4 of that Chapter is entitled "Burdens of Proof." Section 401, titled "Who Has Burden Of Producing Evidence," descriptively defines the burden of evidentiary production as resting "on the party who would be defeated if no evidence were given on either side." Section 26-1-401, MCA. Section 402 provides that "[e]xcept as otherwise provided by law, a party has the burden of persuasion as to each fact the existence or nonexistence of which is essential to the claim for relief or defense the party is asserting." Section 26-1-402, MCA.

---

[7] Montana, as a "primacy" state pursuant to the federal Surface Mine Control Reclamation Act (SMCRA), *see* 30 U.S.C. § 1253(a) and 30 C.F.R. §§ 926.10–926.30, has jurisdiction over the regulation of coal mining operation and, as such, Montana law applies to this proceeding. *Mont. Envtl. Info. Ctr. v. Opper*, 2013 U.S. Dist. LEXIS 29184, at *8 (D. Mont. Jan. 22, 2013) *aff'd on other grounds*, 766 F.3d 1184 (9th Cir. 2014).

¶16    DEQ points us to *Mont. Envtl. Info. Ctr. v. Dep't of Envtl. Quality*, 2005 MT 96, 326 Mont. 502, 112 P.3d 964 (*MEIC 2005*), where we relied on §§ 26-1-401 and -402, MCA, to determine that the Board appropriately placed the burden on the party challenging DEQ's issuance of an air quality permit in a contested case. *MEIC 2005*, ¶ 16 (concluding that, "as the party asserting the claim at issue, MEIC had the burden of presenting the evidence necessary to establish the facts essential to a determination that the Department's decision violated the law.").

¶17    Conservation Groups, for their part, point to *Bostwick Props., Inc. v. Mont. Dep't of Natural Res. & Conservation*, 2013 MT 48, 369 Mont. 150, 296 P.3d 1154, and *In re Application for Change of Appropriation Water Rights Nos. 101960-41S & 101967-41S*, 249 Mont. 425, 816 P.2d 1054 (1991) (*In re Royston*). In *Bostwick*, we heard an appeal from judicial review of a Department of Natural Resources and Conservation (DNRC) decision denying a water use permit. On appeal from judicial review, we repeatedly rejected Bostwick's efforts in arguments before this Court to shift the burden of proof to DNRC on disputed factual matters, as § 85-2-311, MCA, had clearly placed the burden on the applicant of demonstrating the lack of any adverse effect. *Bostwick*, ¶¶ 36, 38, 40–41. Similarly, in *In Re Royston*, we held that the Water Use Act placed a burden of proving an absence of adverse effect on the applicant and that, when the agency proposed to deny it and thereafter held a hearing, the evidentiary burden of proving those facts did not shift to the objector. *In re Royston*, 249 Mont. at 428, 816 P.2d at 1057. As DEQ points out, in both these cases, the applicant had initially been denied

12

the permit, and was therefore the challenger, rather than the defender, of the agency's initial permitting decision at the hearing stage.

¶18    Both DEQ and Conservation Groups are partially correct, but miss the key point. Conservation Groups are correct that MSUMRA requires the applicant, Westmoreland, to bear the evidentiary burden of proving no material damage to be entitled to approval of its permit application. *See Bostwick*, ¶ 10 (burden of proving necessary factual elements for issuance of a water use permit is on the applicant); *In re Royston*, 249 Mont. at 428, 816 P.2d at 1057 (same); § 82-4-227(3)(a), MCA (application for MSUMRA permit must "affirmatively demonstrate[] that . . . the proposed operation of the mining operation has been designed to prevent material damage . . . ."); § 26-1-401, MCA (burden of producing evidence is on the party that would be defeated if no evidence were given). However, DEQ is correct that Westmoreland, having succeeded in this showing before the DEQ's permit issuers, need not re-prove the factual elements of its case a second time before the Board. Rather, Conservation Groups—as challengers to a DEQ permitting decision—are the party that must bear a burden before the Board. *See MEIC 2005*, ¶ 16; Admin. R. M. 17.24.425(7) (2012) ("The burden of proof at such hearing is on the party seeking to reverse the decision of the [Department].").[8]

---

[8] DEQ contends that the words "of the board" were erroneously inserted in place of the words "of the department" pursuant to a scrivener's error during a 2012 rulemaking implementing a transfer of responsibility for MSUMRA contested case hearings from DEQ to the Board, resulting in the word "department" being replaced by the word "board" throughout the administrative rules and accidentally inserted here. *See State v. Heath*, 2004 MT 126, ¶ 32, 321 Mont. 280, 90 P.3d 426 (interpretation leading to absurd results should be avoided where reasonable alternatives consistent with the provision's purpose); 24 Mont. Admin. Reg. 2735–36 (Dec. 22, 2011); 2005 Mont. Laws ch. 127, § 6(9). We agree, as the regulatory provision is entitled "Administrative Review" and remainder of the provision exclusively describes proceedings before the Board to review DEQ

13

¶19    During a challenge to a DEQ decision pursuant to a MAPA contested case proceeding, the question becomes whether DEQ followed the law in appropriately applying the correct procedural and substantive requirements of MSUMRA.[9]  The challenger to DEQ's permitting decision—Conservation Groups, in this case—has the burden of persuading the Board that the answer is no.  *See MEIC 2005*, ¶ 16.

¶20    "[A] party has the burden of persuasion as to each fact the existence or nonexistence of which is essential to the claim for relief or defense the party is asserting."  Section 26-1-402, MCA.  Here, the fact essential to the claim for relief Conservation Groups asserted before the Board was that DEQ had erred in its permitting decision.  This layering of burdens upon review should be familiar: a defendant appealing from a conviction must bear the burden of proving reversible error, but not of proving innocence beyond a reasonable doubt.  *See State v. Bailey*, 2004 MT 87, ¶ 26, 320 Mont. 501, 87 P.3d 1032 (while it is the State's burden to prove guilt beyond a reasonable doubt in a criminal trial, on appeal, "[i]t is the appellant's burden to establish error by a district court"); *see also* §§ 2-4-612(2), 82-4-206(2), MCA (providing that MAPA, contested case,

permitting decisions, otherwise making no reference to judicial review of Board decisions.  *See* Admin. R. M. 17.24.425(7) (2012).

[9] The relevant requirements here are that DEQ may not issue a permit without an "assessment of the probable cumulative impact of all anticipated mining in the area on the hydrologic balance . . . by the department" and a determination that the application "affirmatively demonstrates" that the "proposed operation of the mining operation has been designed to prevent material damage to the hydrologic balance outside the permit area."  Section 82-4-227(3), MCA; § 82-4-206, MCA (contested case hearing is held subsequent to the department's decision that the interested party seeks to challenge).

incorporated into MSUMRA Board review, is bound by common law and statutory rules of evidence unless otherwise provided for).

¶21 Thus, Conservation Groups were required to show before the Board that DEQ's decision violated the law, by methods including evidence or argument sufficient to show that DEQ's conclusion—that Westmoreland's application had produced enough evidence to bear its burden of proving that the proposal was designed to prevent material damage—was in error. *See MEIC 2005*, ¶ 16.

¶22 The members of the Board discussed the appropriate burden of proof at length before issuing its order, modifying some of the language regarding burdens of proof contained in the hearing examiner's proposed findings of fact and conclusions of law. The Board presented the burden correctly at one point in its order, stating that "[i]n this contested case hearing, therefore, MEIC has the burden of proving by a preponderance of the evidence that DEQ's decision to issue the permit violated the law." However, at multiple other points throughout the order, the Board used somewhat confusing language indicating a reliance on other burdens of proof and persuasion. The Board determined that Conservation Groups had "the burden to show, by a preponderance of the evidence, that DEQ had information available to it at the time of issuing the permit that indicated that the project at issue is not designed to prevent" material damage, and that "the burden of proof in this action falls to Conservation Groups *to present a more-likely-than-not probability that a water quality standard could be violated* by the permitted action," that Conservation Groups failed "to present evidence necessary to establish the *existence of any water quality standard violations* with respect to the AM4 Amendment," or "the facts essential to a

15

determination that the AM4 Permit *is not designed to prevent material damage.*"
(Emphases added.)

¶23 The District Court concluded that reversal of the burden of proof was plainly prejudicial error. Implicit with the court's ruling was that the Board required Conservation Groups to prove that material damage would occur if the mining activity was expanded. However, a review of the record does not leave this Court with a definite and firm conviction that such a mistake has been made. Throughout the briefing it is clear that DEQ acknowledges that Conservation Groups had the burden of proof to show DEQ's decision violated the law. *See MEIC 2005*, ¶ 16. Their reply brief cites to the Board's twelfth conclusion of law to support their position:

> Conservation Groups have the burden to show, by a preponderance of the evidence, that DEQ had information available to it at the time of issuing the permit that indicated that the project at issue is not designed to prevent land uses or beneficial uses of water from being adversely affected, water quality standards from being violated, or water rights from being impacted.

¶24 Conclusion of Law No. 12 is not inconsistent with our discussion above regarding the burden of proof required from Conservation Groups—showing that the permit approval was in violation of the law.

¶25 The District Court's conclusion that reversal of the burden of proof was "plainly prejudicial error" is reversed. In any event, we conclude below that other District Court rulings are affirmed and agree that this matter must be returned to the Board for additional proceedings. We anticipate the parties will be clear as to respective burdens of proof required by Montana law.

16

¶26  *Issue Two: Whether the Board of Environmental Review improperly limited Conservation Groups' evidence and argument.*

¶27  Prior to DEQ's issuance of a CHIA and findings of fact providing reasoning for approving Westmoreland's permit application, Conservation Groups filed objections with DEQ opposing the permit. During subsequent proceedings before the Board, DEQ and Westmoreland made motions in limine to bar Conservation Groups from raising any issues (or presenting argument or evidence related to such issues) that they did not already raise in their pre-CHIA objections to Westmoreland's permit application. The hearing examiner granted the motion, determining that Conservation Groups would be limited to presenting evidence and argument at the contested hearing either (a) relevant to only those issues it had raised in prior objections or (b) if Conservation Groups could show that they had somehow been caught unawares by a portion of the CHIA. At the hearing, the hearing examiner repeatedly sustained Westmoreland's objections to Conservation Groups' questioning of its witnesses as relating to unpreserved issues.[10]

¶28  The hearing examiner limited Conservation Groups to argument and evidence regarding the following issues, which she deemed to have been sufficiently preserved by their pre-CHIA objections to Westmoreland's permit application:

---

[10] During the hearing, the parties vigorously argued about option (a)—whether the testimony could be tied back to something said in pre-CHIA objections—but seemingly failed to mention option (b), whether the testimony related to new analysis in the CHIA that was a surprise to Conservation Groups.

- the material damage determination regarding increased TDS levels in the Creek;

- the material damage determination regarding increased nitrogen levels in the Creek; and

- the material damage determination regarding aquatic life use of the Creek.

¶29 During the hearing, Conservation Groups were prevented from soliciting testimony from its witnesses relating to the following issues pertinent to our discussion here:

- alleged impacts of the Permit on Rosebud Creek;

- alleged impacts from blasting;

- the CHIA's definition of "anticipated mining" to exclude consideration of proposed unpermitted mining operations in Area F from its cumulative impact analysis;

- the CHIA's failure to make a determination on de-watering of the Creek through the permit and past mining;

- the impact of dissolved oxygen levels in the Creek on aquatic life; and

- the impact of chloride levels in the Creek on aquatic life.

¶30 The District Court reversed, finding no statutory authority for the Board hearing examiner to preclude Conservation Groups from presenting argument and evidence on issues not raised prior to the contested case. On appeal, DEQ points to § 2-4-702(1), MCA, which requires a challenger to "exhaust[] all administrative remedies available within the agency," arguing that filing a "written objection" to a MSUMRA permit application pursuant to § 82-4-231(8)(e), MCA, is an administrative remedy that must be taken. However, exhaustion of administrative remedies under § 2-4-702(1), MCA, speaks to a party's duty to obtain a final decision from an agency before proceeding to judicial review. The doctrine of administrative issue exhaustion can limit *issues* considered on judicial

18

review to those raised during an administrative appeal. *See Sims v. Apfel*, 530 U.S. 103, 107–08, 120 S. Ct. 2080, 2084 (2000) (distinguishing exhaustion of administrative remedies (i.e., no judicial review until the final agency decision has been reached) from administrative issue exhaustion—issues not raised during an administrative appeal are not reviewable on judicial review when statute so provides); *Vote Solar*, ¶ 48 ("A party forfeits argument as to an issue not raised during the administrative process.").

¶31    DEQ's argument fits within neither exhaustion of administrative remedies nor administrative issue exhaustion, as it seeks to impose an issue preservation requirement *within* the administrative process, not on judicial review. DEQ points us to nothing in MSUMRA, MAPA, or associated regulations, limiting the issues a party may raise in a contested case to those that were raised earlier. DEQ appears to argue that the doctrine of administrative issue exhaustion should be transplanted from the judicial review context to the administrative hearing context, even in the absence of statutory or regulatory authority.

¶32    The United States Supreme Court has noted that "it is common for an agency's regulations to require issue exhaustion in administrative appeals," which are generally approved of by the courts. *Sims*, 530 U.S. at 108–09, 120 S. Ct. at 2084. However, DEQ points us to no such requirement in its regulations. To the contrary, § 82-4-206, MCA, provides that a "person with an interest" adversely affected by a MSUMRA permitting decision may request a hearing before the Board on such a decision "by submitting a written request stating the reason for the request within 30 days after the department's decision." Moreover, § 2-4-612(1), MCA, provides that "[o]pportunity shall be afforded to *all parties* to respond and present evidence and argument on *all issues* involved" in a

19

contested case. (Emphasis added.) *See also MEIC 2005*, ¶ 22. The relevant statutes do not appear to require an aggrieved party to have raised prior objections with DEQ *at all* in order to bring a challenge before the Board.

¶33 The "requirements of administrative issue exhaustion are largely creatures of statute," and courts only impose them in the absence of such statute where the administrative proceeding below was analogous to normal adversarial litigation in courts and the parties were expected to develop the issues in an adversarial proceeding. *Sims*, 520 U.S. at 109–110, 120 S. Ct. 2084–85. There is nothing prior to the Board contested case that is sufficiently analogous to an adversarial proceeding to justify imposing an issue preservation requirement at that stage.

¶34 DEQ points to Westmoreland's permit application process as a potential analogue, noting that the public had access to Westmoreland's pending application, containing a lengthy PHC report and addendum, and had ample opportunity to object to its sufficiency before a permit was issued. Admin. R. M. 17.24.401(3)(d) (2012), -402(2) (1996), -404(3) (2004).[11] However, nothing in MSUMRA or MAPA envision an adversarial process between applicant and objector, with DEQ as adjudicator. The first truly adversarial process that appears in the MSUMRA process is between objector (Conservation Groups) and permitter (DEQ) in a contested case. There is no earlier adversarial posture between Conservation Groups and DEQ in which issues regarding DEQ's decision making could have been raised and preserved prior to a contested case.

---

[11] Conservation Groups took this opportunity to object on numerous grounds.

20

¶35　DEQ complains that this puts it in the unenviable position of having to defend against an untold amount of nitpicking of perceived flaws in its CHIA—after years of preparation—for the first time in a litigation context (the contested case), rather than giving the agency an opportunity to in good faith address and remedy any concerns prior to finalizing its decision. This is a problem of DEQ's own making. In contrast to the Montana Environmental Procedure Act process for producing an Environmental Impact Statement or Environmental Assessment, which have draft and final versions, DEQ does not publish a draft CHIA to give the public an opportunity to view and comment on the substance of DEQ's decision-making rationale before making a final decision. Admin. R. M. 17.24.405(1) (2004).[12]　DEQ's proposed approach essentially shields its substantive analysis from any form of review. However, MSUMRA itself, § 82-4-231, MCA, provides three separate opportunities for public comment—when the application is administratively complete (§ 82-4-231(6), MCA); following the Department's determination that the application is acceptable (§ 82-4-231(8)(e), MCA); and, significantly here, after the Department makes a decision on the permit, subsection (9) allows "[t]he applicant, a landowner, or any person with an interest that is or may be adversely affected by the department's permit decision" to submit a written notice requesting a hearing and stating the "grounds upon which the requester contends that the decision is in error" (§ 82-4-231(9), MCA). This statute is not restricted to a person who has submitted

---

[12] Though the CHIA draws heavily upon information in the application and PHC, it does not track it precisely. Unlike the PHC, the CHIA applies the factual information to the relevant legal standards, engaging in lengthy "material damage" analysis.

comments earlier in the process, much less to comments that may have been previously submitted.

¶36 Conservation Groups sought to challenge DEQ's analysis on issues related to anticipated mining, dewatering of the Creek, high levels of chloride, and low levels of dissolved oxygen that could affect invertebrates in the Creek. These issues had not hitherto been made available to the public. The first time this analysis was subjected to an adversarial process was in the contested case hearing, and it was therefore inappropriate to apply an administrative issue exhaustion requirement at that stage. The District Court held that issue exhaustion does not apply to administrative review of permits under MSUMRA. Moreover, the court held that error was prejudicial as it precluded a "merits-based" ruling on Conservation Groups' claims.

¶37 We affirm the District Court's order and remand to the District Court to return to the Board for additional considerations consistent with this Opinion. Foreseeing an appealable issue, the hearing examiner allowed Conservation Groups to present substantial offers of proof on each of these issues, with the stated intent of allowing the Board to reach a substantive ruling without necessitating further testimony should her evidentiary decisions be reversed. On remand, it is within the purview of the Board to determine whether additional testimony is needed on these issues or whether the offers of proof contained in the contested case transcripts are sufficient for the Board to address the merits of Conservation Groups' claims.

¶38    *Issue Three:   Whether the Board of Environmental Review improperly relied on facts and opinions regarding salinity concentrations that were not included in the Cumulative Hydrologic Impact Assessment.*

¶39    During the permitting phase, DEQ requested that Westmoreland provide additional information regarding the predicted long-term effects of mining on surface water quality in the Creek, particularly how "increased saturation of spoil adjacent to the stream [is] likely to affect long term water quality in the stream and alluvium."  Westmoreland responded in a February 2015 addendum to its PHC that "[t]he best projection that can be made at this time is that, in the long term, the average TDS concentrations in the alluvium and stream *would have a net increase of about 13 percent over <u>baseline</u> concentrations*," fueling much of the current litigation.  (Italicized emphasis added.)  Westmoreland advised that the rate of that increase was "impractical to predict" but that the time frame "likely involves several decades after mining in Area A and B ceases."  Referencing this material, DEQ's CHIA stated that "mass balance calculations estimate that average TDS in alluvium between areas Area A and Area B is expected to experience a 13% increase over the baseline TDS," and that "[a]n increased volume of spoil would also be created in mining AM4 resulting in a longer period of recovery of . . . water quality."  Nonetheless, it concluded that "[w]ater quality of the alluvium is expected to meet narrative standards for current and postmine water uses and will not exceed numeric HHS [(Human Health Standards)]" and that, while "[w]ater quality in the stream may change with spoil saturation, . . . suitability for aquatic life, are expected to be maintained."

¶40    Conservation Groups challenged these conclusions before the Board and filed a motion in limine, seeking to bar expert testimony by Westmoreland or DEQ's witnesses

that would bolster such conclusions with evidence or reasoning beyond that contained in the CHIA. Conservation Groups contended that the administrative ruling *In re Bull Mountain Mine*, No. BER-2013-07 SM (Jan. 14, 2016), established that the information in the CHIA must be sufficient, alone, to maintain DEQ's permitting decision, without resort to post-hoc rationales. The hearing examiner issued an order granting in part and denying in part the motion, stating that DEQ and Westmoreland's evidence "will be limited to evidence that explains and demonstrates that the evidence before the agency at the time of its permitting decision and the analysis within the CHIA satisfy applicable legal standards." (Internal quotation omitted and cleaned up.) The order indicated that the hearing examiner would address proffered evidence on a case-by-case basis as it came up at the hearing.

¶41 At the contested case hearing, Westmoreland presented evidence by its expert, William Schafer, Ph.D. (soil science), who had worked on Westmoreland's permit application. Conservation Groups lodged a standing objection to any testimony on material that was not submitted in the permitting process. Westmoreland contended that Schafer's testimony was in rebuttal to the testimony of Conservation Groups' expert witness, William Gardner, who testified that mining would lead to an "observable" 20 percent increase in alluvial TDS concentrations in the Creek. Schafer disputed Gardner's characterization, testifying that he did not believe that the projected increase in the Creek alluvial TDS would be "measurable," as any such increase was dwarfed by the natural variability the Creek experienced between typical low-volume baseflows (dominated by groundwater sources and subject to significant evaporation resulting in high TDS concentrations) and spring

runoff (during which periods the Creek experienced high flows and correspondingly-low concentrations of TDS).

¶42 Schafer went on to describe an analysis that predicted that any TDS increase in the Creek's alluvial groundwater or surface water, when accounting for natural variability, would not be reliably statistically significant using a sample set of twelve pre- and post-mine conditions.[13] The parties stipulated that Schafer's probabilistic analysis was not contained in DEQ's CHIA or Westmoreland's PHC or addendum to the PHC.

¶43 Another Westmoreland expert, Dr. Nicklin, who had also worked on the PHC, similarly testified that large variations in the Creek's flow rates between spring runoff and summer months led to correspondingly-large variations in TDS concentrations. Dr. Nicklin testified that he did not use a "robust statistical analysis to draw that conclusion" but instead based his "interpretation more on experience," knowing that "a change that small is not going to be observable in a system like this."

¶44 The hearing examiner's Proposed Findings of Fact and Conclusions of Law concluded as a matter of law that "[t]he only relevant facts are those concluded by the agency in the permitting process before the agency makes its permitting decision." However, its findings of fact—incorporated into its final conclusions of law on material damage—cited to Schafer's testimony regarding his statistical analysis as showing that any increase in TDS "would not be statistically significantly measurable" due to the "inherent

_____

[13] Schafer testified that the permit itself would have no "effect on any of these calculations" and that the permit would add a mass of salinity to the Creek's alluvium that would not translate to an increase in concentration in the water, but, rather, extend the duration of that heightened concentration.

variability of the system." The hearing examiner's only citation to the CHIA is to a graph of the Creek's measured flow rates and TDS concentrations since 1979, showing values ranging from above 3500 mg/L to below 2000 mg/L during that time. The Board's final order adopted the substance of these findings and reasonings.

¶45 Admin. R. M. 17.24.405(6) (2004) provides that DEQ cannot approve a permit application unless DEQ's "written findings confirm, on the basis of information *set forth in the application or information otherwise available* that is compiled by the department" that no material damage will result. (Emphasis added.) Likewise, Admin. R. M. 17.24.314(5) (2012) provides that DEQ's CHIA "must be sufficient to determine, for purposes of a permit decision, whether the proposed operation has been designed to prevent material damage . . . ." In *In re Bull Mountain Mine*, ¶ 66, the Board held that, in a contested case challenging the sufficiency of a CHIA, "the only relevant analysis is that contained within the four corners of the CHIA and the only relevant facts are those concluded by the agency in the permitting process before the agency makes its permitting decision."

¶46 On judicial review, we defer to reasonable agency interpretations of its own rules implementing statutes. "[T]his Court affords 'great deference' to agency decisions implicating substantial agency expertise." *MEIC 2019*, ¶ 20 (quoting *Winchell v. Mont. Dep't of Nat. Res. & Conservation*, 1999 MT 11, ¶ 11, 293 Mont. 89, 972 P.2d 1132). *Bull Mountain's* interpretation of Admin. R. M. 17.24.405(6) (2004) and 17.24.314(5) (2012) as requiring DEQ's permitting decision to be supportable before the Board without

reference to information that was not available to and relied upon by DEQ at the time of the permitting decision is reasonable.

¶47 Conservation Groups assert that Schafer's statistical analysis demonstrating that the projected increase in alluvial TDS was not statistically significant in light of natural variations was not contained in the CHIA and not otherwise available or relied upon by DEQ at the time of its decision. Westmoreland argues that Schafer's testimony was properly admitted as rebuttal to testimony by Conservation Groups' expert, Gardner, asserting that mining would lead to a 20% increase in alluvial TDS. Additionally, the Board relied on Dr. Nicklin's testimony that an experienced professional would know that such a small, expected increase in TDS would not be significant in light of the Creek's natural variations is consistent with the information demonstrated by Figure 9-23 of the CHIA, and is indicative of information DEQ officials would have had and relied upon at the time of the CHIA.

¶48 The District Court determined that allowing DEQ and Westmoreland to present post-decisional evidence and analyses simultaneously limiting Conservation Groups to evidence and argument contained in their pre-decisional comments "created an uneven playing field" and was plainly prejudicial. To the extent that the District Court relied on the "uneven playing field" rationale, the court was correct. We note that we affirm the District Court on Issue Two—that it was reversible error to preclude Conservation Groups from presenting argument on certain evidence.

¶49 MAPA, as incorporated into MSUMRA pursuant to § 82-4-206(2), MCA, provides that "all parties" may "respond and present evidence on all issues involved." Section

2-4-612(1), MCA; *MEIC 2005*, ¶ 22. DEQ asserts this section allows DEQ to supplement its reasoning beyond that provided in the CHIA.

¶50    We reverse the District Court conclusion to the extent that the court determined it was reversible error to admit Schafer's report and testimony as proper rebuttal, given that his opinion is drawn from information contained in the CHIA or otherwise compiled by DEQ during the permit approval process. Information regarding projected increase in TDS and its potential impact was present throughout this entire process. Montana law is clear that a court may not substitute its judgment for that of the agency as to the weight of the evidence or factual issues. *Nw. Corp*, ¶ 26; § 2-4-704(2), MCA. Rulings may be reversed for clear error if a review of the record leaves the court with a definite and firm conviction that a mistake has been made. *Nw. Corp.*, ¶ 26. We cannot conclude such a mistake has been made here.

¶51    MSUMRA states DEQ's permitting decisions appealed to the Board are subject to "[t]he contested case provisions of [MAPA]." Section 82-4-206(2), MCA. MAPA's contested case hearing provision states "[o]pportunity shall be afforded *all parties* to respond and present evidence and argument on *all issues involved*." Section 2-4-612(1), MCA (emphasis added); *MEIC 2005*, ¶ 22.

¶52    DEQ's permit must base a decision on whether material damage will occur on the basis of information "set forth in the application or information otherwise available that is compiled by the department." Admin. R. M. 17.24.405(6) (2004). Based on all of the evidence and material presented at the hearing, it was not reversible error to admit

28

Schafer's statistical analysis in support of his opinions. We reverse the District Court on this issue.

¶53     *Issue Four: Whether the Board of Environmental Review erred in holding that extending the duration, but not the magnitude, of a water quality violation could not constitute material damage.*

¶54     As noted, the Board order reviewed the evidence that Area A and Area B mining would lead to a projected 13% increase in TDS concentrations in the Creek's alluvium. *See* ¶¶ 39, 44 of this Opinion. Because the surface water of the Creek was already saturated with salt, the additional salts in the alluvium would not statistically significantly increase the surface water's TDS concentrations. However, as noted in Schafer's testimony, the additional salt in the alluvium was expected to increase the duration for which the Creek's surface water would remain at a heightened TDS level—extending recovery time after reclamation for "some tens or hundreds of years" according to DEQ's expert, Dr. Emily Hinz. The Board found that "as a matter of law," the "increase in duration of time is not . . . relevant for a material damage analysis" because "material damage is merely a magnitude threshold" and the permit "will not increase the pollutant concentration."

¶55     The District Court found the Board's exclusion of increased duration of heightened salinity in the material damage analysis to be an error of law. On appeal, Westmoreland argues that extended duration is like "driving a car . . . for a longer distance," and that "[a]s long as the car's speed remains below the speed limit, the higher speed does not violate the law even if it occurs over a longer" time period. Conservation Groups respond that Westmoreland has the right analogy but the wrong facts; it contends that the Creek is already violating water quality standards due to excess salinity and that extending the

29

duration of this violation is akin to continuing to drive over the speed limit after receiving a ticket, thereby putting the driver in jeopardy of multiple speeding violations.

¶56 By definition, material damage under MSUMRA includes any violation of a water quality standard. Section 82-4-203(32), MCA (2015). Westmoreland and DEQ argue that inserting Montana Water Quality Act (MWQA) requirements into a MSUMRA proceeding was error, citing *Clark Fork Coal. v. Mont. Dep't of Nat. Res. & Conservation*, 2021 MT 44, 403 Mont. 225, 481 P.3d 198 (*Clark Fork 2021*). Although *Clark Fork 2021* occurred within the context of a proposed mining operation, the issue in the case was the availability of water pursuant to a beneficial use permit from DNRC for the projected exercise of a water right pursuant to § 85-2-311(1)(a)(ii), MCA (water quantity). Objectors unsuccessfully argued that issues of water quality pursuant to § 85-2-311(1)(g), MCA (the non-degradation provisions of the Water Quality Act), had to be applied by DNRC in making a determination that the use of water proposed in the application was "legally available." Under its facts, *Clark Fork 2021* has no precedential value on the issues relevant to material damage in MSUMRA.

¶57 We have not previously determined whether delaying an already-impaired water body's return to compliance with water quality standards could constitute "degradation . . . by coal mining and reclamation operations of the quality . . . of water . . . to an extent that . . . water quality standards are violated"—constituting "material damage" under MSUMRA. Section 82-4-203(32), MCA; *see also* § 82-4-227(3)(a), MCA (permit applicant must show proposal is "designed to prevent material damage to the hydrologic balance outside the permit area"). We have noted that Montana's main

30

degradation policy "applies during permitting to all new or increased discharges after April 1993. This policy outlines three levels of water protection and stipulates what degradation, if any, is allowable in each level." *MEIC 2019*, ¶ 12 n.6 (citing § 75-5-303, MCA; Admin. R. M. 17.30.701–718). Montana's water quality statutes provide for assessment of penalties for water quality violations on a daily basis, indicating that each additional day of failure to comply with a water quality standard is regarded as a new violation. Section 75-5-611(9)(a), MCA (allowing for an administrative penalty of up to "$10,000 *for each day* of each violation" (emphasis added)). Therefore, each day that a stream that otherwise would have complied with water quality standards, but does not because of coal mining, constitutes a "degradation . . . by coal mining . . . to an extent that . . . water quality standards are violated" and therefore is "material damage" under MSUMRA. Sections 82-4-227(3)(a), -203(32), MCA. We conclude that the Board erred as a matter of law in holding that delaying a stream's return to compliance to water quality standards cannot constitute material damage under MSUMRA.

¶58 The Board erred when it concluded that no water quality standard violation could occur because:

> [w]ater quality standards are . . . evaluated through pollutant concentrations. Essentially, either a pollutant concentration is exceeded, or it is not; and, if the pollutant concentration is not exceeded, then there is no water quality violation. Here, the AM4 will not violate a water quality standard for TDS because it will not increase the pollutant concentration.

(Internal citations omitted.) First, it is undisputed that the Creek does not currently have a numeric water quality standard for TDS or any other pollutant concentration. Rather, it

31

has a narrative water quality designation for ability to support associated aquatic life.[14] Second, as described above, a water quality violation may consist of an increase in duration of an existing violation without requiring an increase of magnitude.

¶59 On the record before the Court at this time, it is not necessary for us to address the question of whether increasing the magnitude of a preexisting water quality violation constitutes material damage under MSUMRA. *See Friends of Pinto Creek v. United States EPA*, 504 F.3d 1007, 1011–13 (9th Cir. 2007) (federal NPDES permitting program does not allow for permitting of new point source discharge into a stream that is already in excess of numerical limit for pollutant unless the existing dischargers into the segment are subject to compliance schedules designed to bring segment back into compliance with water quality standards (citing 40 C.F.R. § 122.4(i) (2000))).

¶60 It is unclear to what extent the Board's ultimate conclusion rested on this erroneous legal interpretation. For one, it remains disputed and unclear on this record the extent to which: (1) the Creek is in fact currently in violation of water quality standards, (2) heightened salinity is connected to any violation of aquatic life support water quality standards, (3) mining, generally, causes heightened salinity in the Creek, and (4) the permit, specifically, will cause heightened salinity in the Creek's alluvium. These factual matters are within the purview of the Board to resolve on remand as necessary to its ultimate conclusion. We remand to the District Court to remand to the Board for additional proceedings consistent with this Opinion.

---

[14] As noted, the Creek is designated as C-3 surface water—suitable for various uses including bathing, swimming, and propagation of non-salmonid fishes.

¶61    *Issue Five: Whether the Board of Environmental Review improperly excluded the cumulative impact of mining activity from its analysis.*

¶62    Conservation Groups maintain that the Board order dismissed the importance of a 13% increase in the Creek's alluvium as attributable to all mining in areas A and B and relied on a finding that the permit project, alone, would not cause a water quality violation. The District Court faulted the Board for failing to properly consider cumulative impacts of mining.  DEQ contends that the Board did not improperly examine the permit amendment in isolation and that the District Court improperly excised MSUMRA's requirement that a causal relationship exist between the proposed permit activity and the material damage.

¶63    In *MEIC 2019*, we noted that the permit acknowledged the Creek was impaired and that there was no established total maximum daily load (TMDL) budget.  *MEIC 2019*, ¶ 11. Additional effluent limitations apply to impaired waters, which are waters not meeting a water quality standard required by the water's classification.  Section 75-5-103(13), MCA; *MEIC 2019*, ¶ 40.

¶64    Section 82-4-227(3)(a), MCA, states that DEQ may not approve a MSUMRA permit until (1) DEQ makes an "assessment of the probable *cumulative impact* of all anticipated mining in the area on the hydrologic balance" and (2) the application affirmatively demonstrates that "*the* proposed operation of the mining operation has been designed to prevent material damage to the hydrologic balance outside the permit area." (Emphases added.)  Conservation Groups emphasize the first requirement, an assessment of cumulative impacts, while DEQ emphasizes the second, that the application demonstrate

33

that "the" proposed mining operation—not some other mining operation—will not cause material damage.

¶65 Both parties are partially correct. An anticipated "material damage" must actually be caused by the proposed mining operation for which a permit is being sought. Section 82-4-227(3)(a), MCA ("*the proposed operation of the mining operation* has been designed to prevent material damage" (emphasis added)); *Bull Mountain*, ¶¶ 84–88 (substantive MSUMRA standard is whether the "proposed mining operation will cause violation of water quality standards"). Thus, a proposed mining operation that would have *no impact whatsoever* on water quality would not be prohibited under § 82-4-227(3)(a), MCA, even if other mining operations in the area were causing a water-quality-standard violation. However, while the proposed mining operation must have some causal connection to a material damage, both the statute and the Department's rules require the Department to consider the effects of the proposed operation combined with "the impacts of *all previous, existing and anticipated mining* on surface and ground water systems." Admin. R. M. 17.24.301(32) (2012) (defining "cumulative hydrologic impact area") (emphasis added). *See also* Admin. R. M. 17.24.301(31) (2012) ("'cumulative hydrologic impacts' means the expected total qualitative and quantitative, direct and indirect effects of mining and reclamation operations on the hydrologic balance.").

¶66 If the proposed mining operation will have some causal effect on water quality, DEQ cannot ignore its combination with the "cumulative impact" stemming from "all previous, existing, and anticipated mining" in the area in its determination of whether the proposal will lead to a violation. Thus, a proposed mining operation that will have only a

34

small impact on a stream may still fail to be "designed to prevent material damage" if other anticipated mining in the area has pushed the water body 99% of the way to a water-quality violation, and the new proposed operation's small impact is the proverbial straw to break the water-quality camel's back. *See Trustees for Alaska v. Gorsuch*, 835 P.2d 1239, 1246 (Alaska 1992) (interpreting Alaska's coal mining statute as requiring the agency to consider the "cumulative impact of all anticipated activities . . . whether or not the activities are part of the permit under review" and withhold permit approval if "cumulative impact is problematic" until such problems are resolved).

¶67    The Board found "no evidence that the AM4 Amendment, which is the only permitting decision at issue in this case, will cause any increase in salinity to the [Creek] alluvium," noting that the increase represented "the overall TDS that is added to the groundwater by all the mining in the area, including previously permitted areas." (Emphases in Board order.) But the order also found no "convincing evidence that the Creek's existing impairment was previously attributed to operations of the Rosebud Mine." In fact, the Board concluded, the evidence indicated that impairments in the lower part of the Creek likely were attributable to downstream sources such as the town of Colstrip and those in the upper part of the Creek region likely were "attributable to its inherent nature as an ephemeral stream and the loss of streamside vegetation, most likely as a result of agriculture." The Board emphasized that "there must be some causal connection between the permitted mining activity and a water quality violation." DEQ maintains that the Board's determination is based on DEQ's findings: (1) that the 13% increase would be indistinguishable from natural variations of salinity in the Creek, (2) that the Creek's

35

existing impairment is likely from non-mining sources, and (3) that the permit amendment would not change the groundwater class of the Creek's alluvium. But in the same discussion, the Board relied on its finding that the permit amendment would not cause material damage "because it will not increase the pollutant concentration" but only "the duration of time" during which salt loads are higher. For the same reasons discussed above, it is unclear from the Board's order whether its determination of "no material damage" depends on its discussion of an increase in the duration of water quality impairment as opposed to other factors in the record. It is further unclear from the Board's emphasis on the 13% increase being attributable to "all the mining in the area, <u>including previously permitted areas</u>," whether the Board considered the AM4 Permit amendment in the context of all other mining activities when it determined that the operation was designed to "prevent material damage to the hydrologic balance outside the permit area." Section 82-4-227(3)(a), MCA.

¶68 Pursuant to § 82-4-227(3)(a), MCA, the relevant questions the Board should have asked in reviewing DEQ's CHIA were (1) whether the cumulative impacts of the permit proposal and all other "previous, existing and anticipated mining" in the area would lead to a water quality violation and (2) whether the proposed permit amendment is a cause of such a violation. Answering both questions in the affirmative would indicate that DEQ had made an error in issuing the permit.

¶69 In *Water for Flathead's Future, Inc. v. Mont. Dep't of Envtl. Quality*, 2023 MT 86, 412 Mont. 258, 530 P.3d 790, a citizen's group made a similar argument regarding a challenge to a Montana Pollutant Discharge Elimination System (MPDES) permit issued

pursuant to § 75-5-402, MCA, to a corporation seeking to operate a water bottling facility. We held that an agency, at the time of issuing a final permit, must consider the individual, cumulative, and secondary environmental impacts of a proposed action pursuant to Admin. R. M. 17.4.609(3)(d) (1989). *Water for Flathead's Future*, ¶ 31. The Court cited the definition of "cumulative impact" as:

> the collective impacts on the human environment of the proposed action when considered in conjunction with other past and present actions related to the proposed action by location or generic type. Related future actions must also be considered when these actions are under concurrent consideration by any state agency through preimpact statement studies, separate impact statement evaluation, or permit processing procedures.

Admin. R. M. 17.4.603(7) (1989). In the case at bar, we consider a different set of Administrative Rules. However, the definition of cumulative impacts is informative. Similar to the MPDES rules, Admin. R. M. 17.24.405(6)(c) (2004) also specifies the applicant must demonstrate that "cumulative hydrologic impacts will not result in material damage."

¶70    We affirm the District Court and order remand to the Board to address the potential cumulative impacts of the permit amendment pursuant to the requirements of § 82-4-227(3)(a), MCA.

¶71    *Issue Six: Whether the Board of Environmental Review improperly relied upon evidence regarding aquatic life.*

¶72    As part of its assessment to determine whether AM4 would cause material damage to the Creek's aquatic life, the CHIA addresses macroinvertebrate surveys conducted on

the Creek in the 1970s and a similar survey (the Arcadis report) conducted in 2014 by Westmoreland's consultant, Penny Hunter, at the request of DEQ's hydrologist, Dr. Hinz.[15]

¶73    The CHIA concluded that the Arcadis report "demonstrated that a diverse community of macroinvertebrates was using the stream reach.  Therefore, the reach currently meets the narrative standard of providing a beneficial use for aquatic life."

¶74    Before the Board, Conservation Groups challenged this determination, pointing to unrebutted evidence that the Arcadis report was neither intended nor appropriate for use in determining whether the Creek was meeting its C-3 aquatic life support water-quality standards under MWQA.[16]  The Board determined that the "narrative standard of providing a beneficial use for aquatic life" under MSUMRA was distinguishable from the same standard under MWQA, such that use of a metric that would be unacceptable for the latter was acceptable for the former.  The District Court overturned this determination as arbitrary and capricious, which Appellants now challenge.

¶75    Appellants contend that the Board and CHIA's use of the term "beneficial use for aquatic life" was not a direct reference to the C-3 water-quality standard under MWQA but, rather, a reference to a distinct standard of the same name under MSUMRA, pointing

---

[15] We note as an initial matter that this issue is a narrow evidentiary issue on whether DEQ could consider a prior study on aquatic life to support a finding that AM4 is designed to prevent material damage in the future.  We conclude that it was proper for DEQ to evaluate this evidence in its CHIA, especially given the little weight it was afforded and the other evidence DEQ considered.

[16] DEQ uses other metrics, such as the physical characteristics of the streambanks to make such determinations on ephemeral eastern Montana streams.

38

to *Clark Fork 2021* for the proposition that MSUMRA and MWQA serve differing purposes.

¶76    However, MSUMRA does incorporate water-quality standards by defining "material damage" to include degradation by coal mining to such an extent that "water quality standards are violated." *See* §§ 82-4-227(3)(a), -203(32), MCA (defining "material damage"). There is no contention that this reference to "water quality standards" somehow excludes the detailed water quality standards provided by MWQA. As noted above, *Clark Fork 2021* does not support Appellants' contentions. Nevertheless, while MSUMRA incorporates water-quality standards, it does so only in a predictive sense, requiring that a proposed mining operation be "designed to *prevent*" such a water-quality standard violation from happening in the future. Section 82-4-227(3)(a), MCA (emphasis added). The *current* status of the Creek's aquatic life support—whether assessed against a MWQA standard or some other, lesser standard—is only legally relevant to the MSUMRA permitting decision inasmuch as it is predictive of future material damage (including violations of water quality standards).[17]

¶77    It was within DEQ's fact-finding purview, in its CHIA, to determine what weight, if any, to give to the Arcadis Report in making such a prediction about the permit's effects on the Creek. DEQ determined in its CHIA that the Arcadis Report established the existence of "a diverse community of macroinvertebrates" in a particular reach of the

---

[17] The current status of the Creek's compliance with MWQA water-quality standards could become relevant under MSUMRA because, as noted elsewhere in this Opinion, extending the duration of an existing violation may constitute material damage under MSUMRA.

Creek, indicating that it was, to a certain extent, "providing a beneficial use for aquatic life." Conservation Groups point to no evidence suggesting that DEQ was unaware of the Arcadis report's limitations or otherwise inferred too much from its results.[18]

¶78 Conservation Groups note that the Board's findings of fact regarding invertebrate studies on the Creek repeatedly referenced comparisons between the data produced in the 2014 Arcadis Report and that produced in the 1970s, which it described as a baseline "before a large amount of mining" and that current aquatic life is consistent "with historic data." The groups contend that both the CHIA and uncontroverted expert witness testimony established that direct numerical comparisons were likely to be unreliable in light of changes in methodology.

¶79 The Board's action was not arbitrary and capricious. The CHIA's reference to the Arcadis Report as demonstrating some amount of aquatic life existing in the Creek did not render DEQ's permitting decision unlawful. "[T]o ensure that agency decision-making is scientifically-driven and well-reasoned, this Court affords 'great deference' to agency decisions implicating substantial agency expertise." *MEIC 2019*, ¶ 20 (quoting *Winchell*, ¶ 11).

¶80 Additionally, the District Court found that the hearing examiner erroneously allowed the author of the CHIA, Dr. Hinz, to testify as an expert witness on a topic she was not qualified as an expert on—aquatic life—in violation of M. R. Evid. 702. However, the hearing examiner ruled that Dr. Hinz would be able to testify as "to what [she] used the

---

[18] Dr. Hinz, who authored that portion of the CHIA, testified as to the limited use to which the results of the Arcadis Report were put.

report for—how [she] used the report, what [she] did with it in terms of the CHIA, and why [she] needed it, but to the extent that it starts going into this expert area that [she] admittedly [is] not [an] expert[] in, it will be excluded." The factual findings in the portion of the Board order cited to by the District Court and Conservation Groups do not reference Dr. Hinz's testimony in support of, or regarding any, substantive assertions on aquatic life. Rather, the Board order's factual findings on aquatic life only reference portions of Dr. Hinz's testimony that clearly comply with the hearing examiner's ruling, explaining her decision-making process in requesting and using the Arcadis Report in the process of formulating the CHIA and permitting decision. Dr. Hinz did not testify as an expert about aquatic life, she testified as a fact witness regarding her own decision-making process in formulating the CHIA that Conservation Groups were challenging as inadequate. The record contained no indication of a violation of M. R. Evid. 702.

¶81    Montana courts may not substitute their judgment for that of the agency as to the weight of the evidence on questions of fact. Section 2-4-704(2), MCA. "A finding of fact is clearly erroneous if it is not supported by substantial evidence in the record, if the fact-finder misapprehended the effect of the evidence, or if a review of the record leaves the court with a definite and firm conviction that a mistake has been made." *Nw. Corp.*, ¶ 26. "The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of evidence." Section 2-4-612(7), MCA. "We therefore defer to consistent, rational, and well-supported agency decision-making." *MEIC 2019*, ¶ 26. The District Court's conclusions on the Board's reliance on admissibility of aquatic life in the Creek are reversed.

41

¶82    *Issue Seven: Whether the District Court erred in its award of attorney fees.*

¶83    DEQ appeals from the District Court's rulings that granted Conservation Groups attorney fees against DEQ. DEQ argues the District Court erred both in the scope and the amount of attorney fees awarded. First, it argues the court incorrectly awarded attorney fees that resulted from the Board proceedings because the court is statutorily limited to awarding only those attorney fees that arose out of the judicial review. Second, DEQ argues the court erred in the amount of the award because it found DEQ liable for fees generated by work Conservation Groups' attorneys performed specific to the case against Westmoreland and because it calculated an excessive hourly rate for Conservation Groups' lead attorney.

¶84    In the proceedings below, the District Court first made a determination as to the scope of the attorney fees it could award, concluding in its April 21, 2022 Order on Peti[ti]oners' Motion for Fees and Costs that, under MSUMRA, Conservation Groups had demonstrated they were eligible for reasonable attorney fees because they obtained some degree of success on judicial review, and this favorable ruling arose as a result of their advocacy efforts. The court further concluded that it was authorized to award Conservation Groups reasonable attorney fees not only for their actions pertaining to judicial review, but also for their advocacy at the administrative hearing level. After an evidentiary hearing, the court awarded Conservation Groups attorney fees of $862,755.00 and reimbursement of costs in the amount of $33,275.25.[19]

---

[19] DEQ has not explicitly challenged the award of costs on appeal.

¶85    We first consider whether the District Court awarded attorney fees in excess of its statutory authorization.  Section 82-4-251(7), MCA, provides:

> Whenever an order is issued under this section or as the result of any administrative proceeding under this part, at the request of any person, a sum equal to the aggregate amount of all costs, expenses, and attorney fees as determined by the department to have been reasonably incurred by the person for or in connection with the person's participation in the proceedings, including any judicial review of agency actions, may be assessed against either party as the court, resulting from judicial review, or the department, resulting from administrative proceedings, considers proper.

The District Court concluded that this statute authorized it to award Conservation Groups their attorney fees for their efforts expended both before that court and before the Board.

¶86    DEQ raised objections in the District Court and renews its argument here, asserting that § 82-4-251(7), MCA, constrains a district court to awarding attorney fees resulting from district court proceedings while DEQ has sole authority to make the initial determination on attorney fees arising from administrative proceedings, including proceedings before the Board.

¶87    Section 82-4-251, MCA, enacted and numbered § 50-1050 R.C.M. in 1973, initially contained no provision for the award of attorney fees.  In 1979, and after renumbering, § 82-4-251(7), MCA, was added as part of Senate Bill 515.  The language of this subpart remains largely the same in the current version, with minor stylistic changes.  The purpose of SB 515 was "to bring [MSUMRA] into Compliance with Public Law 95-87, the Surface Mining Control and Reclamation Act of 1977."[20]  If MSUMRA complied with federal law,

---

[20] Surface Mining Control and Reclamation Act of 1977, Pub. L. 95-87, 91 Stat. 445 (codified as 30 U.S.C. §§ 1201 et seq. (1982)).

Montana could assume primary jurisdiction for the regulation of coal mining upon approval of the Department of the Interior. 30 C.F.R. §§ 730–732. As such, SB 515 included "only those amendments absolutely essential for compliance with the federal act." Hearing on SB 515 before the House Natural Resources Committee, 46th Legislature (Mar. 20, 1979) (testimony of Sen. Carroll A. Graham, chief sponsor).

¶88 The Legislature enacted SB 515 with the contingency that it would "not become effective until the secretary of interior has conditionally or finally approved the state's permanent regulatory program under Public Law 95-87." Section 82-4-202, MCA (1979), *Annotations*, Compiler's Comments. On April 1, 1980, the Department of the Interior conditionally approved Montana's regulatory program. Conditional Approval of the Permanent Program Submission From the State of Montana Under the Surface Mining Control and Reclamation Act of 1977, 45 Fed. Reg. 21560 (April 1, 1980). The Secretary of the Interior determined that Montana had met the minimum requirements of SMCRA and the Federal permanent program regulations except for minor deficiencies. Conditional Approval, 45 Fed. Reg. at 21560. The Secretary determined, in relevant part, "[t]he Montana program does not provide for award of costs in administrative proceedings, including attorneys fees, in accordance with Sections 520 and 525 of SMCRA and 43 CFR 4.1290 *et seq.* . . . [A] State program must include [similar] provisions." Conditional Approval, 45 Fed. Reg. at 21569. The Secretary provided that the conditional approval would terminate on November 1, 1980, unless Montana submitted "copies of fully enacted regulations containing provisions which are the same or similar to those in 43 CFR 4.1290-4.1296, relating to the award of costs, including attorneys fees, in administrative

44

proceedings, or otherwise amends its program to accomplish the same result" by that date. Conditional Approval, 45 Fed. Reg. at 21579.

¶89 In response, the Board of Land Commissioners and Department of State Lands proposed new administrative rules "outlining the situations in which attorney fees, costs, and expenses may be awarded in administrative proceedings under [MSUMRA] and providing procedures for petitioning for such an award." 15 Mont. Admin. Reg. 2329-2331 (Aug. 14, 1980). These proposed new rules were ultimately adopted, with revisions after public comment, and became effective on October 31, 1980. Admin. R. M. 26.4.1307-1309 (1980) (renumbered as Admin. R. M. 17.24.1307–1309 (1996)). Thus MSUMRA met the federal requirements and Montana's regulatory program was fully compliant with SMCRA.

¶90 In determining whether it could award attorney fees to Conservation Groups for both the judicial review and administrative hearings process, the District Court considered the similarities between MSUMRA and SMCRA and further considered the legislative history that culminated in the Department of Interior approving MSUMRA, including the addition of the Administrative Rules at issue here. The court determined that under MSUMRA, like SMCRA, a member of the public may receive an award of reasonable costs and attorney fees upon a showing of eligibility and entitlement. Under MSUMRA, the criteria for determining eligibility and entitlement are found in § 82-4-251(7), MCA, and Admin. R. M. 17.24.1307–1309 (1996).

¶91 The District Court first determined that Conservation Groups are eligible for an award of attorney fees because they obtained some degree of success under the court's

order, and they are entitled to an award because the order resulted from their advocacy efforts. *See W. Va. Highlands Conservancy, Inc. v. Norton*, 343 F.3d 239, 245 (4th Cir. 2003) (interpreting the corresponding provisions of SMCRA). As noted in the Order on Petitioners' Motion for Fees and Costs, DEQ does not dispute that Conservation Groups are eligible for and entitled to *some* of their attorney fees, but it alleges the District Court exceeded its authority with the scope of the attorney fees awarded.

¶92 DEQ maintains that § 82-4-251(7), MCA, gives DEQ the authority to determine attorney fees resulting from administrative proceedings like those before the Board, while the District Court has the authority to determine the same for court proceedings. The District Court rejected DEQ's argument that the court was limited in awarding attorney fees to those incurred solely on judicial review. According to the court, because Conservation Groups' eligibility for attorney fees under § 82-4-251(7), MCA, was "triggered" when the District Court issued its order, that was the point when Conservation Groups achieved some degree of success. *See* § 82-4-251(7), MCA ("Whenever an order is issued . . . ."). The court reasoned that Conservation Groups could not have sought attorney fees from the Board's final order because that order did not result in any eligibility or entitlement to such award, and neither DEQ nor the Board issued a "final order" that entitled Conservation Groups to an award. Rather, the work Conservation Groups' attorneys performed at the administrative level, where they were unsuccessful, led to Conservation Groups' success upon judicial review. Thus, the District Court concluded that the entirety of Conservation Groups' entitlement to attorney fees resulted solely from

46

the judicial review and pursuant to § 82-4-251(7), MCA, and therefore the court could assess those fees against DEQ.

¶93 As the court explained, the administrative proceedings "ultimately culminate[d]" in a successful ruling on judicial review. Thus, the question of whether DEQ determines the amount of attorney fees resulting from administrative proceedings is irrelevant here, as Conservation Groups had no entitlement to fees for work they did at the administrative level until they succeeded upon judicial review. *See Save Our Cumberland Mountains, Inc. v. Hodel*, 651 F. Supp. 1528, 1533 (D.D.C. 1986) (rejecting government's argument that petitioners were not entitled to attorney fees for work undertaken on unsuccessful appeal because they ultimately achieved success on a petition for rehearing). Therefore, under § 82-4-251(7), MCA, and the associated administrative rules, the District Court had the legal authority to award attorney fees to Conservation Groups for their work at the administrative level and on judicial review.

¶94 The cases that DEQ relies upon are distinguishable. As DEQ noted in its brief in opposition to Conservation Groups' motion for attorney fees below, in conducting judicial review, the District Court "sits in an appellate posture," and in this case Conservation Groups only obtained success upon judicial review. In most of the cases DEQ relies on in its brief before this Court, the litigant first obtained a favorable ruling at the administrative level. *Norton*, 343 F.3d at 241–42 (litigant achieved some level of success at the administrative level when the Interior Board of Land Appeals remanded the case to the Department of Interior's Office of Surface Mining Reclamation and Enforcement for the development of an adequate record and a new agency decision); *Black Mesa Water Coal.*

47

*v. Jewell*, 776 F.3d 1055 (9th Cir. 2015) (litigant was part of consolidated challenges that obtained some favorable rulings at the administrative level); *Powder River Basin Res. Council v. Wyo. Envtl. Quality Council*, 869 P.2d 435 (Wyo. 1994) (litigant substantially prevailed at the administrative level). In the remaining case, the trial court determined attorney fees were not available because of the type of administrative proceeding that occurred. *Utah Int'l, Inc. v. Dep't of Interior*, 643 F. Supp. 810 (D. Utah 1986) (attorney fees not available for non-adversarial, non-enforcement administrative proceedings). They are thus inapposite.

¶95   Next, DEQ argues that the District Court abused its discretion in the amount of attorney fees it awarded to Conservation Groups by failing to parse the hours claimed by Conservation Groups' attorneys, and by setting the hourly rate for attorney Shiloh Hernandez at $350 per hour. DEQ objected to both the number of hours billed and the rates requested by Conservation Groups in the District Court. DEQ reserved its right to challenge the reasonableness of the requested attorney fees and present arguments and expert witnesses at a hearing.

¶96   The court held this hearing on May 6, 2022. Conservation Groups offered attorney Randy Bishop as their expert witness. On cross-examination, counsel for DEQ unsuccessfully attempted to elicit from Bishop specific information regarding Hernandez's work habits and billing practices. DEQ's counsel then asked that Conservation Groups' attorneys be made available to testify; attorney Roger Sullivan, representing Conservation Groups, responded that Hernandez was available. DEQ's counsel then complained that there was insufficient time left to question both Hernandez and DEQ's expert witness. The

48

court then advised, "[i]f you have questions about Mr. Hernandez's bill he's probably the only one that can answer those. . . [i]f you want to point out parts that you think are inflation of time or whatever you can probably do that in a proposed order and draw attention to those parts of the bill that you think are problematic . . . ." Ultimately, DEQ did not call Hernandez as a witness.

¶97 The hearing proceeded with DEQ calling its expert witness, attorney Maxon Davis, to testify. On cross examination, Davis was asked to clarify whether he proposed reducing the number of hours Conservation Groups' attorneys were claiming. Davis responded that he was not challenging the number of hours billed but only the hourly rate at which those hours were billed. Davis was also asked his "opinion about DEQ being expected to pay for fees that were in response to another party's filing." Davis opined that it was an open question whether such fee shifting was proper and while he believed the answer was best left to the court, he was bothered by the idea that Montana taxpayers might have to pay for time spent by Conservation Groups' attorneys responding to Westmoreland.

¶98 At the close of the hearing, the court asked the parties to provide proposed orders by May 11, 2022. On May 13, 2022, the District Court issued the order that DEQ challenges on appeal. Pertinent to the challenges DEQ makes, the District Court declined to reduce the hours claimed by Conservation Groups, explaining that it was "disinclined to second-guess the reasonableness of the hours invested by counsel for the Conservation Groups." It quoted *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008), in support: "By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and

49

might not have, had he been more of a slacker." Next, it concluded that Hernandez was entitled to an hourly rate of $350. Given Hernandez's billing of 1,826.65 hours, the court calculated his portion of the awarded attorney fees at $639,327.50—the vast majority of the total attorney fees awarded.

¶99 DEQ argues that this Court should conclude that the District Court abused its discretion in awarding attorney fees in two ways: (1) part of the award was for time Conservation Groups billed for litigating against Westmoreland, even though DEQ was aligned with Conservation Groups on some of those issues; and (2) the rate of $350 per hour for Hernandez's work is too high.

¶100 In response, Conservation Groups argue that this Court should not address DEQ's argument regarding the hours Conservation Groups' attorneys billed for litigating against Westmoreland because DEQ did not adequately make this argument before the District Court. Conservation Groups note that DEQ's prehearing brief did not raise this argument, its expert witness declined to challenge the number of hours billed but challenged only the hourly rate, and DEQ only briefly addressed this argument in its posthearing proposed order.

¶101 In reply, DEQ points to the District Court's direction at hearing that DEQ had leave to point out "parts that you think are inflation of time" in its posthearing proposed order. DEQ asserts that it then enumerated specific billing entries to the court that it alleges were incurred against Westmoreland, along with other billing entries that DEQ disputes. DEQ accuses the District Court of "failure to engage in meaningful analysis parsing the hours claimed by [Conservation Groups'] attorneys."

50

¶102 In *Utah Int'l*, the U.S. District Court of Utah held that under SMCRA, the petitioners, who were otherwise entitled to attorney fees because they had obtained some degree of success, were not entitled to attorney fees against the United States on those issues where the petitioners and the United States were aligned against another party to the litigation. *Utah Int'l*, 643 F. Supp. at 818–20. Noting that the petitioners in *Utah Int'l* had cited no cases in which one prevailing party recovered fees from another prevailing party, the U.S. District Court concluded that such award would not be proper under § 525(e) of SMCRA, 30 U.S.C. § 1275(e)—the federal equivalent of § 82-4-251(7), MCA. *Utah Int'l*, 643 F. Supp. at 819.

¶103 We similarly conclude that it is proper to remand consideration of this issue to the District Court for the purpose of excluding from the attorney fee award any hours billed for work Conservation Groups' attorneys performed in relation to those issues in the litigation on which Conservation Groups and DEQ were aligned against Westmoreland.[21] We disagree with Conservation Groups' argument that DEQ failed to preserve this issue, as it set forth specific objections in its posthearing proposed order with leave of court.

¶104 Finally, DEQ argues that the District Court abused its discretion when it concluded that Hernandez was entitled to a billing rate of $350 per hour. In reaching its determination, the District Court used the lodestar calculation, one of the primary methods of calculating reasonable fees that is recognized by Montana courts. *Gendron v. Mont. Univ. Sys.*,

---

[21] Whether Conservation Groups could recover their remaining fees from Westmoreland under § 82-4-251(7), MCA, is not at issue because Conservation Groups did not seek such relief in the District Court. *See Utah Int'l*, 643 F. Supp. at 819.

2020 MT 82, ¶ 12, 399 Mont. 470, 461 P.3d 115. There is a strong presumption that the lodestar represents the reasonable fee to which counsel is entitled. *Norval Elec. Coop., Inc. v. Lawson*, 2022 MT 245, ¶ 52, 411 Mont. 77, 523 P.3d 5. In determining the lodestar calculation, the court further evaluated the reasonableness of hours and rates using the seven factors enumerated in *Plath v. Schonrock*, 2003 MT 21, ¶ 36, 314 Mont. 101, 64 P.3d 984.

¶105 We will not reiterate the court's analysis here but will focus on the two ways in which DEQ alleges the court erred in its calculation. First, DEQ argues that the District Court improperly took the hourly rate charged by Westmoreland's attorneys into consideration in determining whether the rate requested by Conservation Groups was appropriate. As noted above, the District Court evaluated the reasonableness of hours and rates using the *Plath* factors. However, as *Plath*, ¶ 36, holds, the trial court may consider other factors in addition to those enumerated. In this case, in addition to its application of the *Plath* factors, the District Court set forth additional considerations, one of which is that Westmoreland's counsel indicated to the court that, "in 2017 his firm charged rates 'generally higher' than $295–$395 per hour 'for the specialized services involved in this case.'" However, the court was not persuaded by this evidence, finding DEQ's argument that Admin. R. M. 17.24.1309(1)(c) (1996)—which provides that the determination of the rate for attorney fees should consider "the customary commercial rate of payment for such services in the area"—and Davis's testimony regarding the hourly rate had convinced the court to reduce the requested hourly rate to $350 per hour for Hernandez's work in this matter. The mere fact that the court considered the rates charged by Westmoreland's

attorneys in 2017 in determining the hourly rate to award Conservation Groups does not constitute an abuse of discretion.

¶106 Next, DEQ argues that the District Court failed to explain why it awarded Hernandez an hourly rate of $350 when his supervisor Jenny Harbine was awarded only $175 per hour "in a similar environmental case." However, the court addressed this argument in its order: it noted that the case DEQ relied upon was decided in February 2009 and while Harbine is now a more senior attorney than Hernandez, she was not at that time and hourly rates for attorneys have increased in the 14 years since that award was made. We conclude the District Court did not abuse its discretion in awarding Hernandez a higher hourly rate of pay because his now-supervisor, who at that time had significantly less experience than Hernandez does now, received a lower hourly rate in a matter that was litigated over 14 years ago.

¶107 Finally, we address Conservation Groups' request that we award them additional attorney fees on appeal. In support of their request, they rely on § 82-4-251(7), MCA, and *Houden v. Todd*, 2014 MT 113, 375 Mont. 1, 324 P.3d 1157. *Houden* is readily distinguishable, as we awarded attorney fees in that case because the contract which the parties had litigated provided the prevailing party the right to attorney fees and costs. *Houden*, ¶ 53. Section 82-4-251(7), MCA, provides that attorney fees may be assessed on judicial review if the court considers it proper. We decline to award additional attorney fees in this instance.

¶108 We remand to the District Court for recalculation of the amount of fees consistent with the holdings on this issue herein.

53

¶109 *Issue Eight: Whether the Board of Environmental Review was properly included as a party on judicial review.*

¶110 Finally, the Board appeals from the March 12, 2020 Order Denying Respondent Montana Board of Environmental Review's Motion to Dismiss. The Board argues that the District Court erred in ruling that the Board is a proper party in this case.

¶111 The Board is a quasi-judicial board that consists of seven members appointed by the governor. Section 2-15-3502(2), (4), MCA. "'Quasi-judicial function' means an adjudicatory function exercised by an agency, involving the exercise of judgment and discretion in making determinations in controversies." Section 2-15-102(10), MCA.

¶112 The Board is attached to DEQ for administrative purposes only. Section 2-15-3502(5), MCA. As such, it exercises its quasi-judicial function independently, and without approval or control, of DEQ. Section 2-15-121(1)(a)(i), MCA.

¶113 When Conservation Groups filed the Petition for Review of Final Agency Action in the District Court, they named the Board as a defendant. The Board then moved to dismiss, arguing that it was not a proper party to the request for judicial review. The court denied its motion, concluding that although the Board was not a required party pursuant to M. R. Civ. P. 19, the agency that issues a final decision in a contested case *may* be a party to a case seeking judicial review of that final decision. Relying on *Forsythe v. Great Falls Holdings, LLC*, 2008 MT 384, 347 Mont. 67, 196 P.3d 1233, the court denied the motion to dismiss, concluding that the Board may be a party because Conservation Groups alleged specific errors on the Board's part and sought relief against the Board.

¶114 On appeal, the Board argues that Conservation Groups should not have named it as a party, and in denying its motion to dismiss, the District Court misapprehended *Forsythe's* applicability. The Board argues that this case is more similar to *Young v. Great Falls*, 194 Mont. 513, 632 P.2d 1111 (1981), and *Hilands Golf Club v. Ashmore*, 277 Mont. 324, 922 P.2d 469 (1996), in which this Court determined that the respective adjudicating boards were not parties to those requests for judicial review. The Board asserts that it has been needlessly forced to expend attorney fees and time monitoring this case and argues that we should hold that the Board shall not be named a party to judicial reviews of its decisions unless the Board is a party to the contested case, designated a party by statute, or the issuer of a contested permit.

¶115 Conservation Groups maintain that the District Court correctly denied the Board's motion to dismiss because the Board was a permissible party even though it was not a necessary party under M. R. Civ. P. 19. They also point out that agencies that issue rulings subject to judicial review often appear as parties on judicial review, although these agencies participate in differing degrees. Conservation Groups assert that agencies regularly participate as parties to judicial reviews outside of the three circumstances suggested by the Board and urge this Court not to limit participation to the categories the Board requests.

¶116 In *Forsythe*, Great Falls Holdings, LLC (GFH), applied to the Montana Department of Revenue (DOR) to transfer ownership of a beer/wine license. *Forsythe*, ¶ 8. Certain individuals (Protestors) objected to GFH's application, and DOR then appointed a hearing examiner to conduct a contested case hearing. *Forsythe*, ¶ 9. The hearing examiner ultimately granted summary judgment in GFH's favor, in effect granting its application to

transfer ownership of the license. *Forsythe*, ¶ 11. Protestors then petitioned for judicial review in the District Court, arguing in part that the hearing examiner incorrectly took judicial notice of findings of fact from a similar proceeding and that the hearing examiner unlawfully restricted Protestors' arguments. *Forsythe*, ¶ 12. Protestors opposed DOR's attempts to appear as a party to the judicial review. *Forsythe*, ¶ 12. However, the District Court ruled that DOR could participate as a party and appear in the proceedings. *Forsythe*, ¶ 16.

¶117 Protestors appealed that ruling, among others. *Forsythe*, ¶ 16. On appeal, Protestors relied on *Young*, 194 Mont. at 515–16, 632 P.2d at 1112–13, in which we held that an administrative board is not an indispensable party for purposes of judicial review, and *Hilands*, 277 Mont. at 327, 922 P.2d at 471, in which we did not disturb a district court ruling that denied an agency's motion to intervene on judicial review. We found *Young* and *Hilands* distinguishable because those cases "involved situations . . . where a party sought redress through the administrative process against another party for alleged improper conduct." *Forsythe*, ¶ 30. However, *Forsythe* involved a situation where the judicial review was a review of DOR's conduct in deciding to allow GFH's license transfer application. *Forsythe*, ¶ 31. Thus, we held that DOR "must be granted the opportunity on judicial review to defend its conduct [in issuing the license]." *Forsythe*, ¶ 31.

¶118 In the present case, the District Court determined that the Board is a proper party under *Forsythe's* reasoning because it concluded that Conservation Groups would be unable to obtain relief for alleged errors made by the Board if the Board was not a party. The court noted that Conservation Groups had petitioned for specific relief against the

Board, including a declaration that the Board violated MAPA, MSUMRA, and the Montana Constitution, and reversal of the June 6, 2019 Board order. On appeal, however, the Board points out that the agency at issue in *Forsythe* was a proper party because it was the entity that decided to grant the licensing application whereas in the present case, the Board was only the entity that heard the contested case regarding DEQ's decision to grant the AM4 Permit. We agree with the Board.

¶119 The Board's role in a contested case proceeding is to receive evidence, enter findings of fact based on the preponderance of the evidence presented, and then enter conclusions of law based on those findings. *MEIC 2005*, ¶ 22. Had the Board not been a party to this action, the specified relief—declarations of legal errors and reversal of the decision—would have still been available. A declaration that a deciding body erred as a matter of law and overturning the decision of a judicial entity are within the types of relief that courts routinely grant when they are reviewing the decision of a lower tribunal. And yet in those instances, and in the present case, it is not necessary that the tribunal be a party for that relief to be available. We agree with the Board that the District Court erred in not granting dismissal in this instance and we reverse the District Court's order on this issue.

¶120 We remand to the District Court for an order dismissing the Board as a party in this matter.

## CONCLUSION

¶121 DEQ and Westmoreland argue that any errors were not prejudicial and the Board order should therefore have been upheld. We have concluded that the following constituted errors in the Board's decision:

- Declining to address Conservation Groups' arguments regarding the CHIA's analysis that Conservation Groups did not raise before the CHIA was published;

- Ruling as a matter of law that an extension of the duration of an existing water quality violation could not constitute material damage under MSUMRA; and

- Ruling that impacts from mining operations other than the permit area could not be considered as cumulative impacts, even if the permit itself played some causal role in a violation.

¶122 These errors are not harmless. The record shows that DEQ erred in its assessment and permitting decision. Remand to the Board will require reanalyzing much of the applicable administrative record and resolving numerous factual questions to then examine the ultimate conclusion on material damage.[22] Reweighing of evidence is not an appropriate role for a court on judicial review of agency decisions. Section 2-4-704(2), MCA. The Board has technical expertise that this Court lacks and is the appropriate venue for resolving these issues. *See MTSUN*, ¶ 52 (recognizing agency's superior technical knowledge). On remand, it is within the purview of the Board to determine if more fact-finding is needed, or if a decision can be reached pursuant to the correct legal standards described in this Opinion. *See MEIC 2005*, ¶ 26.

¶123 The District Court's conclusions regarding Issues One, Three, Six, Seven, and Eight are reversed. We affirm the District Court on Issues Two, Four, and Five. This matter is remanded to the District Court for recalculation of attorney fees as determined herein in Issue Seven, and for dismissal of the Board as a party as determined herein in Issue Eight.

---

[22] Additional fact finding will likely be needed as Conservation Groups were only able to admit offers of proof on their remaining issues, which we concluded were proper under Issue Two.

Moreover the District Court is directed to remand this matter to the Board of Environmental Review for proceedings consistent with this Opinion.

¶124 Finally, we affirm and reinstate the District Court's order vacating the AM4 Permit pending remand to the Board for rehearing and analysis consistent with this Opinion. *See Park Cty. Envtl. Council v. Mont. Dep't of Envtl. Quality*, 2020 MT 303, 402 Mont. 168, 477 P.3d 288.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE